**E-FILED**
Tuesday, 15 March, 2016  12:10:10 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SUSAN MARIE OSING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.14-cv-3326 |
| | ) | |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Susan Marie Osing appeals from the denial of her application for Social Security Disability Insurance Benefits ("Disability Benefits") under Title II of the Social Security Act.  42 U.S.C. §§ 416(i), 423.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g).  Osing filed a Motion for Summary Judgment and Memorandum of Law in Support of Remand/Vacate of Decision denying Disability (d/e 15) (Osing Motion), and Defendant Commissioner of Social Security filed a Motion for Summary Affirmance (d/e18).  The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States Magistrate and Reference Order entered April 23, 2015

(d/e 12).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

Osing was born on November 19, 1960.  She left high school during the tenth grade.  She secured a GED in 2009 or 2010.  Certified Transcript of Proceedings before the Social Security Administration (d/e 8) (R.), at 61, 178.  She worked as a security guard at an Illinois State office building known as the Harris Building, in Springfield, Illinois.  Osing alleged that she became disabled on March 3, 2011.  On or about that date, her work as a security guard was reduced to one nine-hour shift a week.  R. 177-78.  Osing has been diagnosed as suffering from osteoarthritis, fibromyalgia, lumbar degenerative disease, obesity, posttraumatic stress disorder (PTSD), borderline personality disorder, depression, chronic fatigue syndrome, chronic headaches, panic attacks, poor memory, and sciatica.  See R. 23, 296-97, 328-29.

On April 13, 1993, Osing was hospitalized at St. John's Hospital, Springfield, Illinois, for depression, helplessness, suicidal and homicidal ideas, anxiety, apprehension, agitation, irritability, and moodiness.  R. 270.  She remained hospitalized for three weeks until her discharge on May 5, 1993.  Dr. Duttala O. Reddy, M.D., treated Osing during the hospitalization.

According to Dr. Reddy, Osing significantly improved during the hospitalization.  At the time of discharge, Dr. Reddy stated that Osing was "totally aware and capable of holding responsibility for her actions and behavior and she reached maximum benefits from the hospitalization."  R. 270.  Dr. Reddy put no restrictions on Osing's activities.  R. 270.

Six years later, in 1999, Osing began undergoing mental health therapy at the Mental Health Centers of Central Illinois (Center) for a psychiatric evaluation.  R. 58, 307.[1]  On December 17, 2004, Osing saw Dr. Jeffrey Bennett, M.D., for an initial psychiatric evaluation at the Center.  R. 307-08.  At the time Osing was known as Susan Rose.  Osing reported to Dr. Bennett that her father sexually abused her as a child.  She reported regular dissociative episodes even while working as a security guard.[2]  She reported that she had been married and divorced twice, and was currently engaged.  She reported that she and her fiancé were recovering alcoholics.  Both attended Alcoholics Anonymous (AA) meetings.  R. 307.  Dr. Bennett assessed Osing with dissociative disorder and a history of incest.

---

[1] Osing testified that she started therapy at the Center in 1999, but Dr. Jeffrey Bennett, M.D., stated in December 2004, that Osing had been in therapy for two years at the Center.  R. 307.

[2] Dissociative symptoms can be "positive" such as "unbidden intrusions into awareness of behavior, with accompanying losses of continuity in subjective experience (. . . such as fragmentation of identity, depersonalization, and derealization)" or "negative" such as amnesia.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 291.  Dr. Bennett's notes indicate positive dissociative symptoms.

Dr. Bennett assigned her a Global Assessment of Functioning (GAF) score of 70.

A GAF score was a clinician's judgment of an individual's overall level of functioning.  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev. 2000) (DSM-IV-TR)</u>, at 32.[3] A GAF score between 61 and 70 indicated some mild symptoms, some difficulty in functioning, "but generally functioning pretty well." <u>Id.</u> at 34. Dr. Bennett prescribed medication and ordered counselling.  R. 308.

Dr. Bennett saw Osing three times, on April 13, 2007, June 8, 2007, and December 31, 2007.  Each time he assessed her with depression and dissociative disorder and gave her a GAF score of 70 or 65-70.  R. 300-03.

On October 21, 2008, Osing saw Tisha Bayless, M.A., QMHP, at the Center.[4]  Bayless assessed Osing with recurrent depressive disorder, PTSD, social phobia, borderline personality disorder, and rheumatoid arthritis.  Bayless assessed Osing with a GAF score of 40.  R. 296-97.  A GAF score of 40 indicated "Some impairment in reality testing or

---

[3] The American Psychiatric Association no longer recommends using GAF scores.  American Psychiatric Association, <u>DSM-5</u>, at 16 ("It was recommended that the GAF score be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.").
[4] The term QMHP means Qualified Mental Health Professional. <u>See</u> <u>e.g.</u>, 405 ILCS 30/6(a) (The term "licensed professionals" in Illinois Community Services Act includes qualified mental health professionals).

communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV-TR, at 34.

On May 19, 2010, Osing went to the Southern Illinois University HealthCare Center for Family Medicine in Springfield, Illinois (SIU Family Medicine). Osing complained of chronic neck pain, tension headaches, epigastric pain, and anxiety. R. 328-29. X-rays of her spine showed trivial degenerative changes at C6-7 and C5-6. R. 327. An ultrasound of Osing's gallbladder was negative. R. 326.

On November 2, 2010, Osing returned to SIU Family Medicine. Osing complained of pain in her right lower extremity, fatigue, fibromyalgia, and tension headaches. She had some swelling in her lower right extremity, but no pitting. R. 322-25.

On April 11, 2011, Osing returned to SIU Family Medicine complaining of stomach pain and right lower quadrant pain. R. 318. Osing reported that she had been laid off from work one month earlier. As a result, she was taking Ativan twice a day for anxiety. R. 319. Osing was assessed with chronic neck pain and anxiety disorder. She was counseled not to take Ativan on a daily basis. R. 318. She received prescriptions for Ativan, Vicodin, and Sertraline. R. 320.

On July 19, 2011, Osing returned to SIU Family Medicine complaining of generalized pain.  She was referred to a rheumatologist for evaluation.  Osing repeated her report that she was laid off work one month earlier and was taking Ativan twice a day.  R. 314.

On October 4, 2011, Osing saw state agency psychologist Dr. Michael Trieger, Psy.D., for a psychological evaluation.  R. 340-43. Osing reported to Dr. Trieger that she suffered from fibromyalgia, osteoarthritis, PTSD, borderline personality disorder, depression, chronic fatigue and chronic headaches.  R. 340.  Osing reported to Dr. Trieger that she was sexually victimized as a child by her father and her father's friends. R. 341.  She reported dissociative episodes when she was anxious. R. 341.  On examination, Dr. Trieger observed that Osing's "mood and affect suggested mild anxiousness and dysphoria."  R. 341.  Dr. Trieger also noted that Osing's "presentation during the interview revealed several clinical markers for anxiety and depressive symptoms."  R. 342.  Dr. Trieger assessed Osing with "PTSD, recurrent, moderate to severe, by claimant report, Depressive disorder with anxiety, by claimant report."  R. 343. Dr. Trieger assessed Osing with a GAF score of 52.  R. 343.  A GSF score of 52 indicated "Moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . ."  DSM-IV-TR, at 34.

On October 10, 2011, state agency psychologist Dr. David Doss, Ph.D., completed a Psychiatric Review Technique form.  R. 344-57. Dr. Doss stated that Osing suffered from mood disturbance, depression with anxiety, and moderately severe PTSD by history.  R. 347, 349. Dr. Doss opined that Osing had mild restrictions on activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  R. 354.

On October 13, 2011, state agency physician Dr. Charles Kenney, M.D., prepared an Illinois Request for Medical Advice form.  R. 358-360. Dr. Kenney opined that Osing's physical impairments of fibromyalgia and osteoarthritis were non-severe.  R. 358.

On November 21, 2011, Osing saw a rheumatologist, Dr. Sriya K. Ranatunga, M.D.  Osing complained of fibromyalgia pain, sleep disturbance, mood disturbance, and migraine headaches.  R. 382.  On examination, Dr. Ranatunga found eleven out of 18 possible positive fibromyalgia tender points.  The pain elicited was 5-8/10.  Osing had normal range of motion generally.  Dr. Ranatunga noted some swelling in Osing's right knee and ankle.  R. 383.  X-rays showed mild degenerative changes in the knees and ankles.  R. 379-81.  Dr. Ranatunga prescribed

Cymbalta for fibromyalgia, discontinued the prescription for Sertraline, and modified the prescriptions for Ativan and Vicodin.  R. 384.

On January 11, 2012, Osing saw Dr. Ranatunga for a follow-up visit. Osing had reported that she could not afford the prescription for Cymbalta, so Dr. Ranatunga had changed the prescription to gabapentin.  Osing had started the gabapentin, but did not think that the medication was helping her pain.  Osing reported that she felt that same as her last visit.  R. 384. On examination, Osing had positive tender points throughout.  She had full range of motion and no active synovitis.[5]  Dr. Ranatunga prescribed Flexeril and discontinued her prescription for Vicodin.  R. 386.

On April 16, 2012, Osing saw Dr. Ranatunga for a follow-up visit. Osing reported that her occipital headaches were better, but otherwise she had no change in her condition.  Dr. Ranatunga continued her medications and discussed the importance of low-impact stretching exercises. R. 458-59.

On May 24, 2012, Osing went to SIU Family Medicine for pain and anxiety.  She was given Ativan (Lorazepam) and Citalopram Hydrobromide for anxiety.  R. 503-06.

---

[5] Synovitis is inflammation of the synovial membranes around the joints.  Dorland's Illustrated Medical Dictionary (32nd ed. 2012), at 1855-56

On June 12, 2012, Osing went to SIU Family Medicine for generalized pain and depression.  She continued to report pain, anxiety, and stress in her life.  Her medications were continued.  R. 500-02.

On July 3, 2012, Osing went to SIU Family Medicine for fibromyalgia pain, anxiety, and depression.  Osing saw Dr. Dae Jeong, M.D., and a resident.  Osing also complained of insomnia.  Osing reported that she felt a little worse.  Osing was prescribed Trazodone for her insomnia.  R. 497-99.  Dr. Jeong stated that he was personally involved with resident in the care of Osing during this visit and approved of the treatment plan.  R. 499.

On October 15, 2012, Osing saw Dr. Ranatunga.  Osing reported that she felt the same.  Dr. Ranatunga changed her prescription for gabapentin and recommended stretching and strengthening exercises.  R. 437-38.

On October 23, 2012, Osing saw Dr. Jeong at SIU Family Medicine. Osing was complaining of back pain, anxiety, and fibromyalgia.  Osing reported that the fibromyalgia pain was about the same.  She reported low back pain.  She reported that she had suffered from low back pain for a year and a half.  She reported that the Ativan suppressed her anxiety well. R. 466.  Dr. Jeong renewed her Ativan prescription.  R. 469.

On November 2, 2012, Dr. Jeong completed a Physical Residual Functional Capacity Questionnaire.  R. 506-11.  Dr. Jeong reported that he

saw Osing twice in the last three months.  He assessed her with
fibromyalgia, lumbar degenerative diseases, and anxiety.  He opined that
Osing was not a malingerer.  Dr. Jeong opined that Osing's pain frequently
interfered with her attention and concentration.  He opined that Osing was
capable of low stress jobs.  He explained that she "can tolerate usual daily
activity."  R. 507.  Dr. Jeong opined that Osing could walk three blocks
without rest or severe pain; could sit for an hour at one time; could stand for
fifteen minutes; could sit for two hours in an eight-hour workday; and could
stand/walk for less than two hours in an eight-hour workday.  R. 507-08.
Dr. Jeong opined that Osing needed to walk around once an hour for fifteen
minutes.  R. 508.  Dr. Jeong opined that Osing needed to shift positions at
will and needed unscheduled fifteen-minute breaks every hour.  R. 508.
Dr. Jeong opined that Osing could occasionally lift less than ten pounds
and never lift any heavier weights.  R. 508.  Dr. Jeong opined that Osing
could never twist, stoop, crouch, squat, or climb ladders, and could rarely
climb stairs.  R. 509.  Dr. Jeong opined that Osing could use her hands to
grasp, turn and twist objects five percent of the time during an eight-hour
workday, but could not use her hands to perform fine manipulations and
could not use her arms to reach for objects. R. 509.  Dr. Jeong opined that
Osing would miss more than four days of work a month due to her

impairments.  R. 509.  Dr. Jeong opined that Osing should avoid noise, extreme stress, and extreme temperatures.  R. 510.

On February 27, 2013, the Administrative Law Judge (ALJ) conducted an evidentiary hearing in Peoria, Illinois.  R. 40-86.  Osing appeared in person and with her attorney via videoconference from Springfield, Illinois.  Osing's husband Greg Osing also appeared as a witness from Springfield.  Vocational Expert George Paprocki also appeared as a witness in Peoria.  R. 41.

Osing testified first.  She testified that she was fifty-two years old at the time of the hearing.  She was 5 feet 4 inches tall and weighed 190 pounds.  R. 42.  She lived with her husband in a mobile home.  She had three adult children who did not live with them.  R. 43.  Osing testified that she received unemployment benefits for eighteen months ending in November 2012.  R. 45.

Osing testified that she left school in the tenth grade and then secured a GED in 2009 or 2010.  She testified that she worked one day a week as a security guard for nine hours.  R. 45, 61.  She testified that she earned $12.10 per hour.  R. 66.  She testified that during her work as a security guard she sat at a desk and got up to move occasionally as she needed.  R. 46.

Osing testified that could not work more than one shift a week,
"Because of my physical pain and psychological issues."  R. 46.  Osing
testified that she was exhausted after her shift, "Your Honor, when – I work
on Fridays and after I get home on Friday, I am – I am—basically I am
wiped out until Sunday.  I'm emotionally exhausted and physically
exhausted."  R. 46-47.  Osing testified about her exhaustion after work, "I
believe some of it is the emotional exhaustion and then the stress, the
anxiety, the – physically sitting in a chair that's uncomfortable and then I'll
have to get up and then it's just constant pain."  R. 67.

The ALJ asked her about applying for unemployment and disability at
the same time:

> Q.    Okay, Well, I'm in a little bit of a dilemma here.  You
> collected unemployment all four quarters of 2003 (sic), first
> three quarters of 2012.  Your application date was July 2011.
> So what it appears to me is that you went to the unemployment
> office and said I'm ready, willing, and able to work, but I can't
> find a job and, therefore, I need your benefits and then you
> continued to tell them that on a weekly basis, I 'm ready, I just
> can't find a job.  You reported in, you know, I've looked and
> there's nothing – not hiring.
>
>        Well, then in July 2011, you went in and said to us, our
> agency, I'm unable to work.  I can't do any jobs at all, I'm in bad
> shape, therefore, I want you to find me unable to work and I
> want to collect benefits from your agency and you told us that
> had been the case since March 3 of 2011.  So but what I see is
> you go to one agency saying I can't work, I just can't find a job,
> I want your benefits, and you go to our agency, I can't work, I
> want your benefits.  So you're working both ends of the line

telling two things with two different agencies that are contradictory.  How do you explain it?

A.      Your Honor, I was applying for work but I was applying for work that I would not be able to do.

Q.      So you were frauding (sic) the unemployment people?

A.      No, it was a requirement and it was out of fear.  I mean, I did –

Q.      But you were – the point is is that you were still telling them under oath that you could work.  Isn't that what you were telling them?

A.      I was going to try even though my physical limitations –

Q.      But you told them you could work but you couldn't find a job, right?

A.      Even though I applied for jobs, I didn't get hired.  I did make an effort.

Q.      Well, you just testified that you only applied for jobs you knew wouldn't hire you.

A.      No, Your Honor, I don't think –

Q.      It doesn't sound to me like you made a very genuine effort.

A.      – I don't think – I don't think I did say that, Your Honor.  I applied for jobs that I wasn't sure I would be able to do, but I was trying to get a job despite that fact even though I know my physical limitations.

Q.      I'm still looking at you're telling one agency you can work and another agency you can't and wanting to collect money from both for the same time period.  That's my dilemma.

A.      Your Honor, I would not have collected from two different agencies.  That'd be dishonest.

Q.      Well, if I were to find you disabled back to March of 2011, then what we do is we pay you for that back period from now back then.  So then you'd get – you've already gotten your money for unemployment and then you'd get a check from us so you would be collecting from both, isn't that what it would be.

A.      Yes, Your Honor, I never thought about that.

R. 47-49.

Osing testified that she had chronic migraine headaches.  She testified that she gets up to three bad headaches a week.  She also testified that she had pain in her lower back that was not relieved by medication.  R. 49.  She also testified that she had chronic pain in her knees and feet. R. 50.  The ALJ stated that people over 40 years of age have chronic arthritic pain.  R. 50.

The ALJ then asked Osing about the Physical Residual Functional Capacity Questionnaire that Dr. Jeong completed on November 2, 2012:

Q.      [W]ere you there when the doctor filled it out?

A.      Yes, I was, Your Honor.

Q.      Did he ask you questions about each of these things?

A.      Yes, he did.

Q.      So you told him what you felt and then he wrote that down?

A.     He filled – well, he had filled out a portion of it on his own and then he just asked me questions to verify some of it.

Q.     So you said he filled out a portion on his own but then he asked you questions?

A.     Yes, I had turned the form –

Q.     You filled out the rest of it?

A.      – I turned the form in to him and he filled it out and then he called me on the telephone like two weeks later and went over the form with me as, you know, to make sure that I guess that he had filled in all the blanks.  And also, Your Honor –

Q.     Did he ask you specifically questions like how long can you stand, how long can you sit, how much can you lift and carry?

A.     Yes, he did, Your Honor.

Q.     Are the answers on the form any different from what you told him?

A.     No, Your Honor.

R. 52-53.  Osing's attorney asked some additional questions about

Dr. Jeong's Physical Residual Functional Capacity Questionnaire:

Q.     Okay.  Now talking about Dr. Young's (sic) RFC, how long have you been seeing Dr. Young?

A.     I was assigned to him in 2012.  They have residents at SIU.  You don't keep the same doctor.  They graduate and move on and then you're assigned to a new one.

Q.     Okay.  So when you dropped this document off to him and asked him to fill it out, part of it was already filled out?

A.      He had gone over it with his supervisor.

Q.      Okay.  So that was based upon the medical records that you had talked –

A.      Yes.

Q.      – from – talked visitations?

A.      Yes.

R 61.  Osing's attorney later asked another question about Dr. Jeong's

Physical Residual Functional Capacity Questionnaire:

Q.      Okay.  Okay.  Because Dr. Young talked about that – that you had some physical restrictions on lifting some weights. How did he determine those?  Was that – I mean have you talked to doctors previously about things you could do, you couldn't do?  Did he ask you the kind of questions about what you could lift and things like that?

A.      I don't remember him asking me about an approximate weight.

Q.      Okay.

A.      But I know that I have difficulty like, okay, with a gallon of milk.  I have a hard time with taking a gallon of milk out of the fridge and putting it back.

Q.      And you've been talking to your doctors at SIU about that, correct?

A.      Yes.

R. 67-68.

Osing testified that she could dress herself and take care of her personal hygiene.  Osing testified that she did not do laundry.  She testified that her husband did most of the house work.  Osing testified that she and her husband made beds together.  R. 55.  She also sometimes helped her husband wash dishes.  R. 56.

Osing testified that she and her husband went grocery shopping together about once a week.  R. 55, 65.  She testified that she did not go to church and did not belong to any social organizations.  She testified that in a normal week, she interacted with her husband, and she spoke by telephone to her daughter and one or two friends.  R. 66.

Osing testified that she and her husband both prepared meals. R. 55.  Osing testified that she only could cook simple things that did not require much concentration.  She testified that she sometimes would start cooking something on the stove top and "forget it's there."  R. 64.

Osing testified about her mental condition.  She testified that she was hospitalized in a psychiatric ward in 1993.  She testified that she experienced, "a meltdown."  R. 58.  She testified that she did not attempt to commit suicide at that time, but she has been "suicidal my entire life."

R. 58.  She testified that she started going to the Center for counseling in 1999.  She said she stopped in 2008 because she did not have coverage to pay for the counselling services.  R. 58.

Osing testified that she had problems dealing with the public.  She testified that her security guard job consisted of sitting at the entrance of the building and checking to make sure people entering the building are wearing the required badges.  She testified that she worked at an Illinois State government office building.  R. 59.  She testified that she had problems with coworkers.  She testified that she was moved to work at a different location.  She testified that she had problems working with a male coworker.  She stated that working with him, "was a huge source of triggers for me with anxiety and sensory flashbacks and we almost came to blows over it and it's not been – that wasn't the first time that I had problems dealing with those issues."  R. 60.

Osing testified that she had panic attacks.  She testified that she sometimes had two to three attacks in a week, and sometimes she would not have any in a week.  R. 61-62.  She testified, "It depends on what is going to trigger the panic attack."  R. 62.

Osing testified that in a typical day she got up at 5:00 a.m.  She made coffee.  She then sat in her computer chair and used the computer to play

games.  She testified that she also read mystery novels.  Osing testified that she could not read a book all the way through without stopping due to her headaches.  R. 63.

Osing testified that she had difficulty remembering things, "Somebody will tell me something important and I'll write it down and then it's gone. Even though it's right in front of me, I'll completely forget about it and it's embarrassing."  R. 64.

Osing's husband Greg Osing then testified.  R. 68.  Greg Osing testified that he and Osing had been married for seven years at the time of the hearing.  Greg Osing testified that he went on Social Security disability in 1999 or 2000.  He testified that he suffered a traumatic brain injury at that time.  R. 69.  Greg Osing testified that he did most of the housework. He testified that Osing was not able to walk the dog.  He testified that she last walked the dog two to four years before the hearing.  R. 70.  He testified that Osing sat at the computer all day playing games.  R. 71. Osing's attorney asked Greg Osing about Osing's ability to deal with other people.  Greg Osing testified, "She can – you mean talking to people?  She can talk to people fine."  R. 71.

Vocational expert Paprocki then testified.  The ALJ asked Paprocki the following hypothetical question:

Q.     I'd like you to assume we have an individual that same age, education, and experience as the claimant; this individual is limited to light work; limited to occasional postural activities. These are the individual's mental impairments and symptoms I find the individual made during times of symptom exacerbation, have moderate limitations on concentration, persistence, and/or pace when attempting complex working tasks; so the individual is limited to jobs that do not require complex or detailed job processes; little in the way of change in job processes or jobs that can be learned in 180 days or fewer.

Do these restrictions effect (sic) the performance of the claimant's past work?

R. 74.  Paprocki answered:

A.     I would think the past work would still be feasible.  This is activity that normally is learned within 90 days.  I don't believe there's any significant complexity to it, much in the way of change and it is light activity as indicated in the DOT and as it was actually performed prior to the job changing to one of a sedentary nature.

R. 74.

The ALJ asked Paprocki whether his answer would change if the

person was limited to no more than occasional work-related interaction with

the public, coworkers, and supervisors.  Paprocki opined that the person

could still perform the past relevant work as a security guard.  R. 75.

The ALJ then asked Paprocki to assume a change in the exertional

level to sedentary work.  Paprocki responded:

A.     Well, of course, she's doing the job which is sedentary now, but as it's normally done and most of the time she spent at that job was also consistent with light work activity so she would

> not be able to do that job.  Let me add that there really are no
> jobs in the security field that are sedentary in nature.

R. 75.  Paprocki explained, "Well, this is – I think it was a special job.  The

job she's doing is sedentary.  My understanding was that there was an

accommodation by the employer."  R. 76.  Paprocki stated, "I believe I got

that from looking at the – looking at some of the evidence in the

employment section."  R. 76.

The ALJ, Osing, and Osing's attorney engaged in a colloquy about

the nature of Osing's job duties.  Osing is referred to as "CLMT" in the

transcript:

> ALJ:        Well, Ms. Osing, in your job now, you spend most of
> it sitting down.  Are you different than anybody else, any of the
> other security guards?  Do they sit as much as you or do then
> not sit as much?
>
> CLMT:      Your Honor, the Harris Building is different than
> other posts than require patrols every hour, maybe every other
> hour.  It's –
>
> ALJ:        The reason I'm asking you about your current job
> right now –
>
> CLMT:      Yes, Your Honor.
>
> ALJ:        – so you're at the post, at the Harris Building, the
> other security guards that work with you at that job at that post,
> do they sit as much as your do or do they sit less?
>
> CLMT:      The other day guard, he does patrols in the parking
> lot and then the guard I work with in the afternoon part of my
> shift I would say he probably does the same amount of sitting.

It's, like I said, Your Honor, it's the only building that doesn't require rounds.

ALJ:        Further comments, counsel?

ATTY:       So you're saying that in the morning the tech – the other guard has to patrol?

CLMT:       Yes.

ATTY:       Okay.  Does the afternoon job – afternoon other security guard, does he get up and walk around the building and stuff like that?

CLMT:       No.

ATTY:       Okay.  Now you're working for the state.  Other buildings are the required to get up, walk around, do sometimes restraining individuals and things like that?

CLMT:       Oh, most definitely, yes.

ATTY:       Okay.  All right.  Now why is your employer treating you differently if you don't mind my asking that question?

CLMT:       It's the building that I'm currently working at.  I've been there for seven years now.

ATTY:       Okay.  But you're the only individual that is kind of given than –

CLMT:       Well, I fill in for the other guard who works Monday through Thursday.  I'm there on Friday.

ATTY:       Okay.

ALJ:        So the one you fill in for, do they sit as much as you do?

CLMT:       Yes, that's correct.

> ALJ:        Sounds to me like the job she's doing right now is a sedentary job.

R. 76-78.  The ALJ concluded that Osing was performing her security guard job as a sedentary exertional level:

> ALJ:        Well, I'm going to find that her – she is performing her present job at the sedentary level.  That's the way that position is being handled and has been at that building for seven years and from 2010 back show as earning SGA.  So it appears to me that the evidence indicates that her current job is a sedentary job.

R. 79.[6]

Paprocki opined that the ALJ's hypothetical person limited to sedentary work could perform Osing's past work as a security guard as she actually performed the job even with a limitation of only occasional interaction with the public, coworkers, and supervisors.  Paprocki opined, however, that all employment would be precluded if the person missed two or more days of work per month.  R. 79.

Paprocki opined that a person performing Osing's past work could not allow her attention to the task to wander or deviate from the task more than ten percent of the time.  R. 80.  Paprocki opined that the person also could not maintain employment if her impairments required her to take more than the standard morning break, lunch break, and afternoon break.  R. 81.

---

[6] SGA means substantial gainful activity.  See 20 C.F.R. § 404.1574.

Paprocki opined that a person might be allowed to take any additional fifteen minutes a day away from work, but not more than that and maintain employment.  R. 81-82.

The hearing concluded.  R. 85.

## THE DECISION OF THE ALJ

The ALJ issued his decision on April 19, 2013.  R. 19-27.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  The claimant must not be able to return to her prior work as she actually performed it or as the work is generally performed in the national economy.  See 20 C.F.R. §404.1560(b)(2) and (b)(3).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Osing met her burden at Steps 1 and 2.  She had not engaged in substantial gainful activity since her alleged onset date of March 3, 2011.  The ALJ found that working one day a week did not constitute substantial gainful activity.  R. 21.  The ALJ found that Osing

suffered from the severe impairments of osteoarthritis, fibromyalgia, mild lumbar degenerative disc disease, obesity, and PTSD.  R. 21.

The ALJ found at Step 3 that Osing's conditions did not meet or equal any Listing.  The ALJ considered Listings 1.04 for spinal disorders, Listing 12.06 for anxiety-related disorders such as PTSD, and Listing 14.09 for inflammatory arthritis.  R. 23.  The ALJ considered Osing's fibromyalgia in the context of Listing 14.09.  The ALJ also considered the impact of Osing's obesity.  The ALJ stated, "Accordingly, the undersigned has fully considered obesity in the context of the overall record evidence in making this decision."  R. 23.

With respect to Listing 12.06 for PTSD, the ALJ found that Osing's condition did not meet the Listing because she had mild limitations on activities of daily living, mild limitations in social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  R. 24.

At Step 4, the ALJ found that Osing had the RFC to perform light work except "she is limited to occasional postural activities; she is also limited to jobs that do not require complex or detailed job processes, little in the way of change in job process from day to day and jobs that can be learned in 180 days or fewer."  R. 24.  The ALJ relied on the medical record, Osing's daily activities, and the opinions of Drs. Doss and Kenney.

R. 26.  The ALJ did not give significant weight to Dr. Jeong's Physical Residual Functional Capacity Questionnaire because Osing testified that she gave Dr. Jeong the answers to the questions, and Dr. Jeong's answers matched the ones she gave him.  R. 25.

The ALJ also found that Osing's statements about the severity of her limitations due to her impairments were not fully credible.  The ALJ relied on her daily activities and the fact that she worked once a week.  The ALJ relied on the fact that she had the concentration to play computer video games all day.  The ALJ also relied on her representations that she was able to work in her requests for unemployment benefits.  The ALJ found, "These factors indicate the claimant is less than fully credible."  R. 25.

The ALJ found that Osing could return to her prior work as she actually performed it and as the job is generally performed.  The ALJ relied on Paprocki's expert testimony to reach this finding.  R. 26.  The ALJ further stated that even if Osing was limited to sedentary work, she could perform her security guard job as she actually performed it.  R. 26.  The ALJ relied on Osing's testimony about how she performed her job and on Paprocki's opinion testimony.  The ALJ concluded that Osing was not disabled.  R. 27.

Osing appealed the decision of the ALJ.  On August 21, 2014, the Appeals Council denied her request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1. Osing then brought this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The x-rays and other imaging showed only mild degenerative changes that did not

meet Listings 1.04 or 14.09.  The ALJ acknowledged that Dr. Ranatunga's trigger points testing showed fibromyalgia, but the ALJ concluded that Osing's condition did not meet a Listing in light of the lack of other medical evidence of severe arthritis.  R. 22, 23.

The ALJ's finding that Osing did not meet Listing 12.06 is also supported by substantial evidence.  In Osing's situation, the Listing requires marked limitations in two or three areas:  activities of daily living; social functioning; and maintaining concentration, persistence or pace.  Listing 12.06(B).  The ALJ found only mild or moderate limitations in these areas. This finding is supported by Dr. Bennett's examination notes, by Dr. Trieger's consultative mental status examination, and by Dr. Doss's opinion.  Dr. Bennett assessed GAF scores of 65 or 70, indicating mild limitations; Dr. Trieger assessed a GAF score of 52, indicating moderate limitations; and Dr. Doss opined that Osing had mild or moderate limitations in these areas.  These opinions provide substantial evidence to support the ALJ's conclusion that Osing did not meet this Listing.

The ALJ finding of no disability at Step 4 is also supported by substantial evidence.  Dr. Kenney opined that Osing had no severe physical impairments.  The x-ray and other imaging showed minor degenerative changes in Osing's joints and spine.  Dr. Ranatunga

observed some swelling, and Osing testified to some physical limitations. The ALJ's RFC finding limited Osing to a reduced range of light work or alternatively, sedentary work.  The limitations in the RFC adequately addressed those physical functional limitations.  Paprocki's opinion supported the conclusion that Osing could perform her past work as a security guard as she actually performed the job even if she was limited to sedentary work.  The ALJ's decision is supported by substantial evidence.

Osing argues that the ALJ erred in finding that she did not meet Listing 12.06.  Osing Motion, at 7.  Osing relies on the 1993 hospitalization and counselor Bayless's 2008 opinion that Osing had a GAF score of 40. The Court finds no error.  Bayless is not an acceptable medical source. 20 C.F.R. § 404.1513(a).  The ALJ relied on the evaluations of a psychiatrist Dr. Bennett in 2007 and a psychologist Dr. Trieger in 2011. See R. 21, 22.  The ALJ also considered the opinion of another psychologist Dr. Doss.  R. 26.  The Court sees no error in relying on the more recent opinions of acceptable medical sources over a twenty-year old hospitalization report and an assessment by a counselor who was not an acceptable medical source.  The Court sees no error.

Osing also argues that the ALJ failed to explain adequately his credibility finding.  Osing Motion, at 8.  This Court will not review the

credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder, 529 F.3d at 413-14.  The ALJ's credibility finding has support in the record.  Osing admitted that she repeatedly represented to state officials that she was able to work in 2011 and 2012 in order to secure unemployment benefits.  Those representations are fully set forth above on pages 12-14.  The representations directly contradicted her allegations of disability.  The ALJ relied on this contradiction to find her less than credible.  The ALJ further found her testimony and her husband's testimony that she used the computer all day was inconsistent with her claims that she could not concentrate.  R. 25.  The record supports these findings.  The Court, therefore, will not disturb the credibility finding.

Osing does not expressly raise any other claims of error.  See generally, Osing Motion.  Osing alludes to several other alleged problems with the ALJ's decision, including the ALJ's treatment of Dr. Jeong's Physical Residual Functional Capacity Questionnaire; the ALJ's consideration of vocational expert Paprocki's opinion that Osing's work was accommodated; the ALJ's consideration of Osing's obesity; and the ALJ's treatment of Osing's fibromyalgia.  Osing does not develop arguments regarding these points, so all of these points are waived.  See United

States v. Adams, 625 F.3d 371, 378 (7th Cir. 2010); Melton v. Colvin, 2015 WL 1279966, at *2 n.1 (S.D. Ind. March 20, 2015).  Even if the Court considered these points, the Court still sees no reversible error.

The Court sees no error in the treatment of Dr. Jeong's opinions.  The opinions of a treating physician are entitled to controlling weight if his opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record."  20 C.F.R. § 404.1527(c)(1).  In this case, the ALJ did not give weight to Dr. Jeong's opinions because the ALJ found that Osing gave him the answers to the questions on the form.  R. 26.  The ALJ could reasonably draw that inference from her testimony quoted above.  If so, then Dr. Jeong did not express medical opinions, but merely recited what Osing reported.  Osing's testimony provided substantial evidence to support this conclusion by the ALJ.

The Court sees no error in the treatment of Osing's obesity or her fibromyalgia.  The ALJ found that these conditions constituted severe impairments.  R. 21.  The ALJ stated that he considered Osing's obesity in his determinations.  R. 23.  Osing also fails to cite any medical records that indicated that her obesity was in any way debilitating.  The ALJ also

recognized that Osing had fibromyalgia and considered her condition in making his findings.  <u>See</u> R. 22, 24.

Lastly, Osing alludes to the fact that vocational expert Paprocki found that her work was accommodated.  Osing does not explain the significance of this Paprocki's observation in this case.  Osing appears to be arguing that the observation supports the conclusion that Osing met Listing 12.06 for anxiety disorders.  <u>See</u> <u>Osing Motion</u>, at 2-4.  Osing speculates that Paprocki drew the conclusion that Osing's work was accommodated from her mental health records.  <u>See</u> <u>Osing Motion</u>, at 2-3.  Osing's speculation is just that, speculation, nothing more.  Paprocki testified that he drew that conclusion from "some evidence in the employment section" of the record. R. 76.  He later testified that he could not locate the exhibits in the record from which he drew this conclusion.  R. 82.  Paprocki did not indicate that he considered medical records in coming to the conclusion that the work was accommodated.

The evidence further supports the conclusion that Osing performed the regular duties of one of the security guards at the Harris Building. Osing testified that at least one of the security guards at the Harris Building could sit most of the day.  She testified that she worked that post for seven years.  She testified that, at the time of the hearing, the person who worked

her shift the other four days a week performed the job the same way she performed it.  She also testified that the person who worked the shift after her shift was not required to walk around the building.  R. 77-78.  The ALJ could properly conclude that Osing performed her work as a security guard in the manner that the job was regularly performed at the Harris Building. The ALJ's RFC finding and Paprocki's testimony, therefore, supported the conclusion that Osing was not disabled at Step 4 because she could return to that past relevant work as the job was actually performed.  See 20 C.F.R. § 404.1560(b)(2).  The Court sees no error.

THEREFORE, Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e18) is ALLOWED; Plaintiff Susan Marie Osing's Motion for Summary Judgment and Memorandum of Law in Support of Remand/Vacate of Decision denying Disability (d/e 15) is DENIED; and the decision of the Commissioner is AFFIRMED.

THIS CASE IS CLOSED.

ENTER:   March 15, 2016


_____*s/ Tom Schanzle-Haskins*_____
UNITED STATES MAGISTRATE JUDGE